## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIAN STRAYER and the** | : | **No. 3:06cv2068** |
| **PENNSYLVANIA LAWYERS FUND** | : | |
| **FOR CLIENT SECURITY,** | : | **(Judge Munley)** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DOUGLAS BARE, ESQ.,** | : | |
| **DARRYL CUNNINGHAM, ESQ.,** | : | |
| **STEPHEN M. FRANKEL,** | : | |
| **FRANKEL & ASSOCIATES and** | : | |
| **WACHOVIA BANK,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### <u>MEMORANDUM</u>

Before the court are defendants' motions to dismiss the instant case.  Having been fully briefed, the matters are ripe for disposition.

**Background**

This case arises out of defendants' representation of plaintiff Brian Strayer in a personal injury action in the Pennsylvania courts.  Defendant Frankel & Associates was a law firm located in York, Pennsylvania and incorporated in 1983 as a Professional Corporation under Pennsylvania law.  (Amended Complaint (Doc. 60) (hereinafter "Complt.") at ¶ 13).[1]  Strayer retained Frankel & Associates to represent him on February 3, 1999.  (<u>Id.</u> at ¶ 15).  Stephen Stambaugh, an associate in the

---

[1]As the case is before the court on a motion to dismiss, we accept all facts alleged in the complaint as true.

firm, represented Strayer on the matter in question.  (Id. at ¶ 16).

Plaintiff Pennsylvania Lawyers Fund for Client Security (PLFCS) made payments to a number of other former clients of the Frankel firm in exchange for subrogation agreements and assignment of rights.  (Id. at ¶ 17).[2]  Those who assigned their rights to the PLFCS had received awards from personal injury litigation which were placed in the Frankel firm's trust account but the funds were never paid to them.  (Id. at ¶¶ 19-37).  These persons all filed claims with the PLFCS and received a portion of the funds which the law firm had allegedly misappropriated.  (Id.).  These payments from the PLFCS ranged from $33 to $75,000, and plaintiffs allege that the total amount of such payments was $767,400.81.[3]  (Id. at ¶¶ 48, 62).  The plaintiffs allege that most of these persons who received payment had formerly been Frankel & Associates clients.  (Id. at ¶ 71).  Plaintiffs also assert that other individuals have similar claims against the law firm, and bring this action on their behalf.  (Id. at ¶ 72).  Plaintiff Strayer was involved in personal injury litigation that resulted in a settlement of $530,000.  (Id. at ¶ 75).  The parties responsible for

---

[2]These clients were: Christina M. Stark, Michael R. and Carla D. Lehr, Jacqueline G. Gotwols, Daniel J. Miller, Ellen J. Blocher, Ninoshka Rivera, Sherrie Grove, parent and natural guardian of Prescilla Grove, a minor, Jeffrey A. Young, Estate of Larry Wilhelm by Althea Craul Administratrix, Shelley W. Kope, Bart E. Frey, Tammy L. Riley, Octavia Hoffman, Michael L. Spahr, Ralph Ebersole, Jean Ebersole, Estate of Chad Livelsberger by Michael R. Livelsberger, Administrator, Mason Fortney, a minor, by Shelly Brown, parent and natural guardian, Robert M. Fisher, David A. Beckwith, Shae Bollinger, Patricia Ann Thompson, Estate of Edwin Castro Galarza by Milagros Galarza Administratrix, Rockwood Casualty Ins. Co./Front Royal Ins. Co., Teresa A. Golden, and Richard L. Ohler.

[3]We arrive at this figure of total reimbursement supplied by the PLFCS by adding together the amounts of individual payments alleged in the complaint.

paying this settlement provided checks in the amounts required to Frankel & Associates.  (Id. at ¶ 76).

Defendant Mark David Frankel was disbarred from legal practice on or about May 24, 2004, and control of Frankel & Associates passed to Stephen Frankel.[4]  (Id. at ¶¶ 73-74).  Defendant Wachovia Bank, a professional corporation, is successor by merger to First Union Corporation, which had succeeded by merger to Corestates Bank, N.A.  (Id. at ¶ 7).  At some time prior to February 2, 1999, Defendant Bare, treasurer of Frankel & Associates, opened a regular banking account and an IOLTA trust account with Corestates Bank.  (Id. at ¶ 77).  Defendant Wachovia Bank took over the trust account from First Union, and had knowledge that the purpose of an attorney trust account was to hold funds of the clients.  (Id. at 78).  Wachovia earned monthly fees from this account.  (Id.).  Wachovia had on its payroll attorneys and accountants, and plaintiffs allege that the bank knew that personal injury claims are not subject to taxation under the United States Internal Revenue Code.  (Id. at ¶ 79).  Wachovia received financial benefit from the trust account, since the bank paid less interest on this account than on other accounts in the bank.  (Id. at ¶ 80).

The bank was aware that interest paid on this trust account, less any charges

---

[4]Mark David Frankel and his son Stephen were tried and convicted in York, Pennsylvania in 2006 on charges related to the scheme here alleged.  A judge found the elder Frankel guilty of 57 counts of theft and one count of misapplication.  The judge also found Stephen Frankel guilty of misapplication of entrusted funds and theft.  Mark David Frankel received a four-year prison sentence.  The court also ordered him to pay restitution.  Stephen Frankel received a sentence of two years of probation.  The court also ordered him to pay restitution.  See Kathy Stevens and Elizabeth Evans, *Mark David Frankel sentenced to nearly 2 years in prison*, THE YORK DISPATCH, 12/27/2006.

on the account, were not the property of the law firm.  (Id. at ¶ 81).   Wachovia also

knew that many of the checks deposited in the trust account were drawn on banks

located outside Pennsylvania.  (Id. at ¶ 82).  Wachovia's knew that the trust account

held client, not law firm, funds.  (Id. at ¶ 83).   Nevertheless, the bank allegedly

facilitated electronic transfers from the trust account to the Internal Revenue Service

(IRS) to satisfy the law firm's tax obligations.  (Id.).  These transfers were made in

interstate commerce.  (Id.).  From 2001 to 2004, electronic transfers in interstate

commerce from the Frankel & Associates trust account to the IRS allegedly totaled

$1,463,316.19.  (Id. at ¶ 92).  All of these transfers were for the firm's benefit, not for

the benefit of the firm's clients.  (Id.).

Wachovia Bank used the United States Postal Service to mail monthly

statements to Frankel & Associates.  (Id. at ¶ 93).  These monthly statements

reflected accurately the unlawful transfers made from the firm's trust account.  (Id.).

Based on this information, the firm determined the amount it needed to deposit from

other client funds to cover past misappropriations.  (Id.).  Plaintiffs allege that this

arrangement constituted a "Ponzi scheme,"[5] since the "trust account was in continual

need of new deposits to cover checks owing to other clients."  (Id. at ¶ 94).  Plaintiff

Strayer discovered this lack of funds when, after settling his case, he was advised

---

[5]"A Ponzi scheme, named after Charles Ponzi, is a scheme whereby the funds from
new investors are used directly to repay or pay interest to old investors, with there being no
operations or revenue-producing activities other than the continual raising of new funds."
69A Am Jur. 2d Securities Regulation–State § 22.

that he would have to wait one month for his checks to clear before he would have access to the funds.  (Id. at ¶ 95).  Defendants knew that this delay was not for the purpose of clearing the checks, but because of defendants' need for cash to cover past advances.  (Id. at ¶ 96).  Defendants Cunningham and Bare were aware of these deficiencies in the firm's trust account and did nothing to address the problem.  (Id. at ¶ 97).  They informed defendant Mark David Frankel of these shortfalls.  (Id.).  The defendants then used plaintiffs' funds to satisfy outstanding obligations created by misappropriation of client funds.  (Id. at 98).

Plaintiffs allege that Defendants Wachovia, Bare, Cunningham and Frankel defrauded plaintiffs using a Ponzi scheme that employed the United States Postal service and interstate commerce in furtherance of their strategy.  (Id. at ¶ 99).  The defendants intended to deprive plaintiffs of funds which were their property.  (Id.).  Wachovia, plaintiffs contend, participated directly in the scheme by operating the escrow account and the wire transfers involved in the case.  (Id. at ¶ 100).  Plaintiffs also allege that the bank "participated directly or indirectly in the conduct or affairs of the enterprise through a pattern of racketeering activity."  (Id.).  Such participation was essential to the operation of the scheme.  (Id.).  Defendant Bare, plaintiffs contend, participated in the unlawful enterprise by establishing the trust account in a manner that allowed unlawful wire transfers and by soliciting client funds to be deposited in the trust account.  (Id. at ¶ 102).  Defendant Cunningham participated in the scheme by misrepresenting his knowledge of the illegal transactions, and by

soliciting funds to be placed in the trust account.  (Id. at ¶ 103).  Defendant Stephen

Frankel participated in the unlawful scheme by improperly handling client funds.  (Id.

at ¶ 104).

Sometime in late October 2004, Steven Stambaugh, who had represented

Plaintiff Strayer in his personal injury suit, learned from the firm's bookkeeper that

the funds in the trust account were insufficient to pay his client.  (Id. at ¶ 118).  This

insufficiency was a product of the firm's improper use of client funds.  (Id.).  Once

notified of this fact, the York County District Attorney's Office brought criminal

charges against Mark David Frankel and Stephen Frankel.  (Id.).

Plaintiffs contend that they were never paid proceeds from their settlement by

Frankel & Associates.  (Id. at ¶ 119).  This failure to pay money owed the plaintiffs

was not the result of any action or inaction by the plaintiffs.  (Id. at ¶ 120).  Instead,

defendants directed that money from the client trust account to be paid to causes

unrelated to plaintiffs' litigation.  (Id. at ¶ 121).  This misappropriation of client funds

caused defendants' inability to pay plaintiffs money from the firm's trust accounts.

(Id. at 122).  Plaintiffs never consented to the use of their funds held in trust to pay

taxes or for any purposes unrelated to their cases.  (Id. at ¶¶ 123-27).  Strayer has

never received the funds from his settlement.  (Id. at ¶ 128).  The assignors of the

claims held by the Pennsylvania Lawyers Fund for Client Security similarly were not

paid the proceeds of their claim settlements.  (Id. at 130).

Plaintiffs also allege that defendants were aware of the inappropriate and

illegal activity of other defendants.  The insolvency of the trust account occurred years before Strayer discovered the problem when he asked for his funds.  (Id. at ¶ 131).  Plaintiffs contend that defendants had knowledge of and acquiesced to improper expenditures from the client trust account by Mark David Frankel.  (Id. at ¶ ¶ 132, 134).  Those expenditures borrowed against the firm's future earnings, and defendants knew or should have known that those expenditures would cause insolvency in the trust account.  (Id. at ¶¶ 133, 135).  The Rules of Professional Conduct, plaintiffs contend, required Defendants Bare and Cunningham to report the Frankels' conduct to the Pennsylvania Disciplinary Board.  (Id. at ¶ 136).  The defendant bank knew of the law firm defendants' illegal electronic transfers, but continued to provide this service.  (Id. at ¶ 140).

Plaintiffs filed a complaint in this court on October 20, 2006.  (See Doc. 1).  The case was first assigned to Chief Judge Yvette Kane.  After being served with the complaint, Defendant Cunningham filed a motion to dismiss.  (Doc. 9).  Before the other parties to the case could respond, plaintiffs on November 16, 2008 filed an amended complaint.  (Doc. 15).  Defendants Wachovia Bank, Darryl Cunningham and Douglas Bare filed motions to dismiss this version of the complaint.  (Docs. 17, 20, 26).  Plaintiffs then filed a motion for leave to file an amended complaint.  (Doc. 46).  On April 16, 2007, Judge Kane issued an order granting plaintiffs' motion to file a second amended complaint and denying defendants' motions to dismiss as moot.  (Doc. 59).  Plaintiff filed this complaint, and the same defendants again filed motions

to dismiss it.  (Docs. 60, 61, 63, 66).  On October 3, 2007, Judge Kane determined that she had a conflict of interest in the matter and removed herself from the case. (Doc. 81).  On October 10, 2007, the case was reassigned to the present judge.

Plaintiffs filed their second amended complaint (Doc. 60), which is the subject of the instant dispute, on April 16, 2007.  The complaint raises seven counts.  Count I, raised against all the defendants except Frankel & Associates, contends that defendants' conduct violated 18 U.S.C. §§ 1962(c)-(d), the Racketeer Influenced and Corrupt Organizations Act (RICO), and seeks treble damages and attorneys fees. Count II claims fraud against all of the defendants, contending that the defendants cooperated to convince plaintiffs to deposit settlement funds in Frankel & Associates trust accounts to further their corrupt scheme.  Count III alleges a breach of fiduciary duty against the individual defendants.  Count IV points to a conspiracy between all the individual defendants to operate the trust account illegally.  Count V, raised against Wachovia Bank, alleges a breach of the duty of good faith and acting in bad faith for Wachovia's facilitation of Frankel & Associates illegal transactions.  Count VI claims conversion against all of the defendants based on their misuse of the client's funds.  Count VII raises a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law against all of the defendants except Wachovia Bank. The parties have briefed the motions to dismiss the complaint, bringing the case to its present posture.

**Jurisdiction**

Because this act arises under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964, we have jurisdiction pursuant to 28 U.S.C. § 1332.  ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  We have supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

**Legal Standard**

The case is before this court on defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  When a 12(b)(6) motion is filed, the sufficiency of a complaint's allegations are tested.  The issue is whether the facts alleged in the complaint, if true, support a claim upon which relief can be granted.  In deciding a 12(b)(6) motion, the court must accept as true all factual allegations in the complaint and give the pleader the benefit of all reasonable inferences that can fairly be drawn therefrom, and view them in the light most favorable to the plaintiff.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).

**Discussion**

Defendants urge that we dismiss the case on a number of different grounds. We will examine each in turn.

**A.  Federal Claims**

Defendants contend that plaintiffs have not stated a claim upon which relief could be granted on their federal claims.  We will address each of the claims in turn.

### i. RICO Claims

Defendants insist that plaintiffs have not stated a claim for RICO violations, either in terms of a conspiracy or for a more straightforward violation of the Act.  To state a civil claim for a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima v. Imrex Co., 473 U.S. 479, 496 (1985).  A "plaintiff only has standing [to make a RICO claim] if he has been injured in his business or property by the conduct constituting the violation." Rehkop v. Berwick Healthcare Corp., 95 F.3d 285, 289 (3d Cir. 1996).  Courts have found that "[a] pattern of racketeering activity requires at least two predicate acts of racketeering," and "may include, inter alia, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343." Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004).

The plaintiffs here allege that the racketeering enterprise conducted by the defendants involved federal mail and wire fraud in relation to the misappropriation of settlement funds.  "The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud." Lum, 361 F.3d at 223 (citing 18 U.S.C. §§ 1341, 1343).  The Third Circuit Court of Appeals has held that "[t]he scope of the federal mail fraud statute is quite broad.  It generally proscribes any 'scheme or artifice to defraud' which in some way involves the use of the postal system." United States v. Pearlstein, 576 F.2d, 531, 534 (3d Cir. 1978).  Thus, an offense under the mail-fraud statute requires "1) the

existence of a scheme to defraud; 2) the use of the mails in furtherance of the fraudulent scheme; and 3) culpable participation by the defendant." Id.

In such cases, "the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity." Lum, 361 F.3d at 223. By "specificity," courts mean that a plaintiff must specifically plead "'the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.'" Id. at 223-24 (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1994)). The plaintiff must either plead "'date, place or time'" of the fraud, or use "'alternative means of injecting precision and some measure of substantiation into their allegation of fraud.'" Id. at 224 (quoting Seville Indus., 742 F.2d at 791). In addition, the complaint must "allege who made a misrepresentation to whom and the general content of the misrepresentation." Id.

Plaintiffs' claims sufficiently articulate a RICO claim against Defendant Wachovia. They allege that defendants engaged in a scheme to misappropriate client funds, placing them in a trust account and then using the mail or electronic means to transfer funds from the this account to satisfy IRS obligations. The complaint also alleges that Wachovia knew of this scheme, profited from it and participated in it despite knowledge that the activity was inappropriate. The bank argues that it merely provided the instrumentality for the fraud, but did not participate

11

in the fraud itself.  Plaintiffs have alleged, however, that the bank was aware that the account had been used to perpetuate the fraud and indeed acted "in conjunction with Defendants Bare, Cunningham and Frankel to unlawfully transfer client funds from the trust account to the IRS to satisfy the firm's tax obligations."  (Complt. at ¶ 107).  In short, the plaintiffs allege that Wachovia knew of the scheme to defraud clients and acted to assist it.  We find that this claim is sufficient to state a RICO claim, and we will deny the motion to dismiss on this point.

Defendant Bare describes plaintiffs' lawsuit as "a last-ditch 'money-grab'" which "must be dismissed" because it does not articulate a claim upon which relief could be granted.[6]  Bare contends that he was not an employee of the firm at the time that the former clients received their settlements, and that he was not involved in any of their cases.  He had previously worked for the firm and arranged the trust account in question as well as a regular banking account for the firm at what became Wachovia Bank.  Bare also set up the trust account so that the firm's obligations to the IRS could be satisfied through the trust account.  Bare contends that the complaint nowhere alleges that he was involved in any scheme to convert client funds, nor that he authorized or profited from such a scheme.

We read the complaint differently; it alleges that the trust account itself served

---

[6]The court is uncertain how an attempt to recover funds owed but never paid to a plaintiff constitutes a "money grab."  The phrase "money grab" appears to imply that the party seeking recovery seeks to obtain a more than fair share.  That situation does seem to apply here.

the RICO enterprise, and that in setting up the account Bare helped to perpetuate the scheme that defrauded clients.  The complaint also lists specific amounts deposited in the trust account on specific dates, as well as the dates and amounts of transfers from the trust account to the IRS.  The complaint also specifies that members of the law firm misrepresented the reasons why money was not delivered to clients as a means of perpetrating their fraud.  With such allegations the complaint states the circumstances of the alleged fraud sufficiently to survive a motion to dismiss.  While Bare may escape liability by alleging to a jury that he was not involved in the scheme, at this stage the allegations are sufficient to deny his motion to dismiss.

Defendant Cunningham likewise contends that the complaint does not allege that he was involved in the direction of any racketeering enterprise and he therefore could not be found liable under the RICO act.  We disagree.  The complaint alleges that Cunningham, by "his misrepresentations and omissions concerning his knowledge of the improper use of the client trust fund . . . participated directly or indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity."  (Complt. at ¶ 103).  This allegation is sufficient to state a RICO claim against defendant Cunningham, whatever the evidence will ultimately show.  The plaintiffs allege that Cunningham participated in a scheme to defraud clients of funds and use those funds to satisfy firm obligations.  They also allege that his actions facilitated operation of that scheme, and that he thereby conducted the

enterprise.  As such, we will deny his motion to dismiss on this point as well.

### ii.  RICO Conspiracy

Defendants likewise argue that plaintiffs have not properly alleged that they were victims of a conspiracy to violate RICO.  Section 1962(d) of the RICO Act provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).  The Third Circuit has emphasized that "one who opts into or participates in a conspiracy is liable for the acts of his co-conspirators which violate section 1962(c) even if the defendant did not personally agree to do, or to conspire with respect to, any particular element."  Smith v. Berg, 247 F.3d 532, 537, (3d Cir. 2001).  Further, "a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise."  Id. at 538.

From this standard, it is clear that plaintiffs have stated a claim against all the defendants for a RICO conspiracy.  Since a defendant can be part of a conspiracy even when that defendant does not participate in all of the elements of the conspiracy, both the lawyer-defendants and Wachovia Bank could be liable based on the facts alleged by plaintiffs.  The bank allowed the account to be established and allowed transfers of money from the trust account to the IRS, knowingly facilitating a scheme to misappropriate client funds.  Similarly, Cunningham and Bare, whatever the evidence may prove of their larger responsibility for the scheme,

allegedly helped erect the trust account in question, made sure that client funds went into the account, and were aware of the misuse of those funds.  Accordingly, plaintiffs have stated a RICO conspiracy claim against all the defendants, and we will deny the motion to dismiss on this point too.

## B.  State Law Claims

All defendants first argue that plaintiffs have not stated any claims for which relief could be granted under federal law, and that the court therefore should not exercise its jurisdiction to hear state-law claims.  Because we have found that plaintiffs state a federal claim, we will deny the motions on that point.  Still, defendants argue that plaintiffs' state-law claims are barred by the statute of limitations, and that they have failed to state claims under Pennsylvania law.  We will address each of their arguments in turn.

### i.  Statute of Limitations

Defendants Bare and Cunningham argue that plaintiffs' state-law tort claims are barred by the statute of limitations.  They offer several grounds for this position, and we will address each in turn.  First, defendants contend that as subrogee, the Plaintiff Pennsylvania Lawyer's Fund must observe the same statute of limitations as the persons whose claims they have assumed.  Pennsylvania courts have found that a subrogee "stands in the [subrogor's] shoes" and therefore the subrogee's "timeliness in petitioning to intervene is measured by the statute of limitations as it accrues against the" subrogors.  Holloran v. Larrieu, 637 A.2d 317, 322 (Pa. Super.

15

Ct. 1994).  The plaintiffs agree that the Lawyer's Fund has served as subrogee in this matter, and that the statute of limitations should be measured against the subrogor's claims.  We must therefore determine the applicable statute of limitations in this case as applied to the parties whose funds the law firm misappropriated, and when that statute began to run.

Defendants argue that the nature of plaintiffs' claim is a tort claim, and that a two-year statute of limitations should apply.  Pennsylvania law requires that a plaintiff bringing a tort claim commence the action within two years of his injury.  See 42 PENN. CON. STAT. §5524(7) (establishing a two-year statute of limitations for "any . . . action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct").  Moreover, Pennsylvania courts have ruled that the statute of limitations begins to run in cases where an injury is ongoing "when the plaintiff knows, or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's misconduct."  Cathcart v. Keene Indus. Insulation, 471 A.2d 493, 500 (Pa. Super. Ct. 1984).

The court agrees that a two-year statute of limitations should apply in this case, and that the conduct which gave rise to the suit occurred more than two years before the plaintiffs filed their complaint.  In the normal course of events, then, the statute of limitations would have run on plaintiffs' state-law claims.  As explained in Section Bii *infra*, however, we find that plaintiffs have alleged facts by which a jury

could determine that the they filed their case within the applicable statute of limitations.

### a.  Discovery Rule

Plaintiff argues that the statute of limitations in this case should be tolled by the discovery rule.  Defendants disagrees.  In most cases, "the statute of limitations begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations, [citations omitted] even though a person may not discover his injury until it is too late to take advantage of the appropriate remedy."  Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983).  The discovery rule, however, "provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible."  Dalrymple v. Brown, 701 A.2d 164, 167 (Pa. 1997).  The discovery rule "arises from the inability of the injured, despite the exercise of due diligence, to know the injury or its cause."  Pocono Int'l Raceway, 468 A.2d at 471.  Courts considering this exception to a statute of limitations must, therefore, "address the ability of the damaged party, exercising reasonable diligence, to ascertain the fact of a cause of action."  Id.  When the discovery rule applies, the statute of limitations is tolled until the plaintiff could reasonably be expected to discover the injury and its cause.  Id.  The question in this case, therefore, is when

the plaintiffs through due diligence could have discovered their injury and its source.

Plaintiffs argue that defendants misrepresented to them why the money in their trust accounts was not available, and that they had no reason to disbelieve the reasons given them by their lawyers for that unavailability.  The nature of the attorney-client relationship, they contend, led them to accept their lawyers' representations about those funds.  Plaintiffs point us to no cases that address the relationship between the attorney-client relationship and the discovery rule.

Courts have found that "[whether the statute has run on a claim is usually a question of law for the trial judge, but where the issue involves a factual determination, the determination is for the jury." Hayward v. Medical Center of Beaver County, 608 A.2d 1040, 1043 (Pa. 1992).  When "the complaining party should reasonably be aware that he has suffered an injury is generally an issue of fact to be determined by the jury; only where the facts are so clear that reasonable minds cannot differ may the commencement of the limitations period be determined as a matter of law."  Id.; see also Fine v. Checcio, 870 A.2d 850, 858 (Pa. 2005) (holding that "'[t]here are [very] few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful.  This is what is meant by reasonable diligence.'") (quoting Crouse v. Cyclops Industries, 745 A.2d 606, 611 (Pa. 2000)).

This case is like Hayward v. Medical Center, where the plaintiff brought an action against the surgeon who removed a portion of his lung more than two years

after the surgery occurred.  608 A.2d at 1043.  Plaintiff had been admitted to the

hospital, complaining of chest and back pain, and x-rays revealed a mass in his right

lung.  Id. at 1041.  Doctors recommended a biopsy, and after an analysis of the

removed material revealed possible cancerous cells, recommended removal of part

of plaintiff's lung.  Id.  Though a later analysis showed that the mass was not

cancerous but simply a blood clot, the defendant surgeon nevertheless continued to

recommend removal.  Id. at 1041-42.  After this surgery, plaintiff experienced

shortness of breath and difficulty breathing.  Id. at 1042.  He sought follow-up

treatment and was told that his condition was an expected result of the surgery.  Id.

Plaintiff had to be hospitalized several times to deal with his lung problems, and

eventually was forced to stop working.  Id.  He consulted a doctor in connection with

his workers' compensation claim.  Id.  The doctor informed him that his surgery was

unnecessary and was a substantial cause of his disability.  Id.

When plaintiff brought his action against the doctors who recommended and

performed the surgery, the doctors argued that Pennsylvania's two-year statute of

limitations had passed before he filed his claim.  Id.  Defendants argued that plaintiff

was aware of his breathing problems shortly after the surgery.  Id. at 1043.  They

pointed out that plaintiff knew shortly after the surgery that his operation was

"predicated on a misdiagnosis" and that he had questioned the need for surgery in

the first place.  Id.  He thus had knowledge of his injury and its source, and failed to

file suit within two years of that knowledge.  Id.  The court disagreed, finding that

19

while "[a] jury could very well find that appellant reasonably should have investigated the need for surgery at the time that he was informed of the misdiagnosis, and thereby, have discovered the alleged malpractice," a jury might also reasonably find that he reasonably relied on his doctor's assurances that he needed surgery. Id. The court therefore found summary judgment inappropriate. Id.

In the instant context, we find that applying the statute of limitations to dismiss the case would be premature. Plaintiffs allege that though the District Attorney seized monies held in the trust account on October 20, 2004, they were unaware that their individual money had been misappropriated or that they had been injured by defendants' actions. Even if we were to reject this argument, we would still find that plaintiffs filed their suit within the two years required by Pennsylvania law. At the earliest, the district attorney's action would have given plaintiffs notice of their claim on October 20, 2004, and the statute of limitations would have been tolled until that point. See Fine, 870 A. 2d at 859 (finding that when the discovery rule applies the statute of limitations begins to run when plaintiff knows or reasonably should know of his injury and its cause.). They filed suit on October 20, 2006, within two years of the date when their claim could have accrued under this argument. Accordingly, plaintiffs filed their claims within the statute of limitations and we will deny the motion to dismiss on this point.[7]

---

[7]Plaintiffs argue that they satisfied several Department of Public Welfare liens on behalf of claimants, and thus enjoy the subrogation rights possessed by the Department for those claims. In addition, since a five year statute of limitations covers such actions, the statute of limitations has not run on those claims. See 62 P.S. § 1409(b)(4). Pennsylvania

### b. Minority Tolling Statute

Defendants Bare and Cunningham argue that the minority tolling statute, 42 Pa.C.S. § 5533(b), does not apply in the case to save certain claims from expiration.[8] Plaintiffs contend that they have been assigned the rights of minors and thus enjoy the same protection afforded those minors under the tolling statute. Plaintiffs offer no authority for this proposition.  Though we have found that a jury could conclude that none of plaintiffs' claims are barred by the statute of limitations, we will address this argument because the minority tolling statute could rescue claims that a jury found were otherwise barred.

Under Pennsylvania law, "the period within which a minor's action must be commenced is measured not from the time the cause of action accrues, but from the time he or she turns eighteen.  This is true regardless of the fact that a guardian may

---

law provides that "[t]he acceptance of medical assistance benefits shall operate as an assignment to the department [of Public Welfare], by operation of law, of the assistance recipient's rights to recover support, specified by a court as support for the payment of medical care, and to payment for medical care from any third." 62 P.S. § 1404(b).  The Department of Public Welfare therefore had a right to seek recovery of medical expenses from defendants in the lawsuits filed by the subrogor plaintiffs.  Any claims plaintiffs had for medical services paid for by the Department were assigned by law to the Department and were subject to a lien. Plaintiffs provide no authority for the proposition that the lawyer's fund can assume the rights to subrogation on those liens enjoyed by the Department of Public Welfare.  The Lawyer's Fund for Client Security was created in the Administrative Office of the Pennsylvania courts "to aid in ameliorating the losses caused to clients and others by defalcating members of the Bar acting as attorney or fiduciary." PA. R.D.E. 502(a).  The purpose of the Lawyer's Fund thus appears to be to provide compensation for victims of lawyers' malfeasance.  The Fund steps into the shoes of those victims, not the shoes of the Department, and we fail to see why the Fund should be assigned the Department's rights.  We will not, therefore, apply the five-year statute of limitations for any Department of Public Welfare liens.

[8]Some of the cases settled by the Frankel firm involved claims by minors.

sue on behalf of a minor at any time after a cause of action accrues." Fancsali v. University Health Center, 761 A.2d 1159, 1164 (Pa. 1999); see also, 42 PENN. CON. STAT. § 5533(b)(1)(i) (establishing that "[i]f an individual entitled to bring a civil action is an unemancipated minor at the time the cause of action accrues, the period of minority shall be deemed a portion of the time period within which the action must be commenced.  Such person shall have the same time for commencing an action after attaining majority as is allowed to others by the provisions of this subchapter.").  To the extent, then, that any plaintiffs were minors at the time of their injuries, they would have two years after their eighteenth birthdays to institute their suits before the statute of limitations would run.

The question here is whether the plaintiffs who are subrogees of minor's claims can enjoy the same minority tolling provisions under the statute as their subrogors.  Pennsylvania courts have not addressed directly the issue of claims assigned by minors when addressing the minority tolling statute.  Courts have treated minors' claims and their parents' claims related to the same injuries separately for purposes of the statute, tolling the minor child's and finding that the parents' had run.  See, e.g., Holt .v Linko, 791 A.2d 1212 (Pa. Super. Ct. 2002). Indeed, "the statute addresses situations in which a minor has no parent or guardian to bring suit on its behalf, or whose parent or guardian may, for any number of perfectly valid reasons, be unwilling or unable to do so." Robinson v. Pennsylvania Hosp., 737 A.2d 291, 294 (Pa. Super. Ct. 1999).  While "[a]dults may choose not to

22

exercise their own rights; minors, unable to exercise their rights, require protection until able to make the decision of whether to pursue the matter." Id.; see also Foti v. Askinas, 639 A.2d 807, 809 (Pa. Super. Ct. 1994) (establishing that "[t]he purpose of the Minority Tolling Statute was to give minors an equal opportunity to bring a cause of action.").

Here, however, there are not two separate claims, one raised by a minor plaintiff and the other raised about a related issue by an adult plaintiff.  Instead, the adult plaintiff is a subrogee who has stepped into the place of the minor plaintiff. "The Rule of Subrogation provides that 'one who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other . . . *Succeeding to the creditor's right, the surety also succeeds to the creditor's means for enforcing it.*'" U.S. Steel Homes Credit Corp. v. South Shore Development Corp., 419 A.2d 785, 788 (Pa. Super. Ct. 1980) (quoting American Surety Company of New York v. Bethlehem National Bank of Bethlehem, Pa., 314 U.S. 314, 317 (1941)) (emphasis in original). We conclude, therefore, that since the Lawyer's Fund is the subrogee for minor plaintiffs' claims against defendants, the Lawyer's Fund has the advantage of the statute of limitations supplied by the minor tolling statute for those claims.  We will deny the motions to dismiss on this point.

 **ii.  State Law Claims**

  **a.  Fraud**

Defendants Bare and Cunningham argue that plaintiffs have not alleged a state-law fraud claim against him.  Pennsylvania courts have found that "fraud is defined as 'anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.'" Walter v. Magee Women's Hosp. of UPMC Health Sys., 876 A.2d 400, 406 (Penn. Super. Ct. 2005).  A tort action for intentional misrepresentation or fraud requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."  Office of Disciplinary Counsel v. Anonymous Attorney A, 714 A.2d 402, 407 n.8 (Pa. 1998); see also RESTAT. 2d of TORTS § 525 (stating that "[o]ne who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.").

Here, the fraudulent scheme alleged surrounds the maintenance of client funds in a lawyer's trust account.  The defendants represented to the plaintiffs that they would hold the money obtained from lawsuit settlements in the trust account. Plaintiffs allegedly allowed their money to be placed in that account on the basis of

such representation.  Plaintiffs also allege that defendants knew that their statements about the trust accounts were false or that they had recklessly disregarded the truth of the claims about the account, and that defendants made those false statements for the purpose of misleading plaintiffs.  Plaintiff contend that they justifiably relied on their lawyers' representations about the nature and purpose of the trust accounts.  Their injuries from the disappearance of the funds in the trust account were a result of their trust in the lawyers' representations.  All the elements of fraud claim have been met and we will deny the motion to dismiss on this point.

The individual defendants allege, however, that they were not involved in the fraudulent scheme.  These assertions, however useful they may be after the close of discovery, are not relevant to a motion to dismiss.  To decide such a motion, we must rely on the allegations contained in the complaint.  Because the complaint alleges that defendant was involved in the scheme to defraud, we will deny the motion to dismiss on this point.

### b.  Breach of Fiduciary Duty

Defendants Bare and Cunningham contend that plaintiffs have not pled sufficiently their claim of breach of fiduciary duty against them.  In Pennsylvania, the "common law imposes on attorneys the status of fiduciaries *vis a vis* their clients; that is, attorneys are bound, at law, to perform their fiduciary duties properly." Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, 602 A.2d 1277, 1283 (Pa. 1992). "A cause of action may be maintained against an attorney for breach of his or her

25

fiduciary duty to a client." <u>Gorski v. Smith</u>, 812 A.2d 683, 711 (Pa. Super. Ct. 2002).

In Pennsylvania, a claim for breach of fiduciary duty exists when a plaintiff alleges

"(1) That the defendant negligently or intentionally failed to act in good faith and

solely for the benefit of plaintiff in all matters for which he or she was employed; (2)

That the plaintiff suffered injury; and (3) The defendant's failure to act solely for the

plaintiff's benefit was a real factor bringing about plaintiff's injuries." <u>Baker v. Family

Credit Counseling Corp.</u>, 440 F. Supp. 2d 393, 414-415 (E.D. Pa. 2006); citing Pa.

SSJI § 4.16.

Defendant Bare cannot dispute that he at some point had a confidential

relationship that would give rise to a fiduciary duty to the plaintiffs, as Pennsylvania

courts have recognized that "[t]he essence of [a confidential] relationship is trust and

reliance on one side, and a corresponding opportunity to abuse that trust for

personal gain on the other." <u>In re Estate of Scott</u>, 316 A. 2d 883, 885 (Pa. 1974).

Bare had precisely that type of relationship with his legal clients, particularly when it

came to handling funds placed in a trust account.  The question in this case,

therefore, is whether Defendant Bare breached his fiduciary duty to the defendants.

The plaintiffs allege that Bare participated in a scheme to misappropriate client funds

for the firm's own purposes.  We will therefore deny Defendant Bare's motion on this

point.

Defendant Cunningham argues that he had no fiduciary duty to any of the

plaintiffs, since plaintiffs have not alleged that any of them were his clients.  He also

insists that plaintiffs have not alleged that his actions were a substantial factor in causing the harm the plaintiffs claim.  The plaintiffs' complaint, however, alleges that "[i]t is believed and therefore averred that the majority of claimants were clients of and represented by Defendants Frankel, Bare or Cunningham."  (Complt. at ¶ 71).  As we are obliged to accept all allegations in the complaint as proved for purposes of a motion to dismiss, we conclude that Defendant Cunningham could have owed–and breached–a fiduciary duty to plaintiffs.  If the evidence reveals that Cunnigham did not serve as attorney for any of the plaintiffs, Defendant Cunningham can address that matter with a later dispositive motion.  We will, however, at this point deny his motion to dismiss on this point.

### c.  Civil Conspiracy

Defendants Bare, Cunningham and Wachovia also contend that plaintiffs' civil conspiracy claim should be dismissed.  In Pennsylvania, "[t]o prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979).  Further, a plaintiff must have "[p]roof of malice, i.e., an intent to injure," and the "unlawful intent must be absent justification."  Id.; see also Skipworth v. Lead Industries Assoc., Inc., 690 A.2d 169, 174 (Pa. 1997) (holding that to prevail on a civil conspiracy claim a plaintiff must show that defendants "acted in concert to commit an unlawful act or do a lawful act by unlawful means, and that they acted with malice.").

27

Here, the allegation is that the defendants together developed a scheme to misappropriate settlement money placed in the law firm's trust account.  Such actions, plaintiffs allege, violate the laws governing trusts.  The law firm and the lawyers in that firm used the money to pay tax obligations they otherwise would have had to satisfy from their share of the profits.  No justification would exist for such misuse of client funds, and knowingly misusing another's property for one's own ends qualifies as malice.  Accordingly, Defendants Bare and Cunningham could be liable for civil conspiracy.  Wachovia, the plaintiffs allege, participated in establishing the account and acquiesced in the unlawful transfers from that account.  The bank profited from the scheme by gaining access to the deposits in the trust account while paying a lower rate of interest than on a normal consumer account.  These actions facilitated a scheme that the bank was aware was without justification and which harmed the plaintiffs.  Such allegations, if proved, would entitle the plaintiffs to relief against Defendants Wachovia, Bare and Cunningham, and we will deny the motions to dismiss on this point.

### d.  Conversion

Defendants Bare and Cunningham likewise argue that plaintiffs have failed to state a claim for conversion.  Pennsylvania courts have defined "conversion as an act of willful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession."  Norriton East Realty Corp. v. Central-Penn Nat'l Bank, 254 A.2d 637, 638 (Pa. 1969).  A defendant need

not engage in "conscious wrongdoing," but can be liable for conversion through "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'" Id. (quoting Prosser, TORTS § 15 (2d ed. 1955)).

Plaintiffs have stated a conversion claim.  They allege that the defendants were part of a scheme by which they took funds that were the property of the plaintiffs and used them to pay the firm's tax obligations.  By participating in this movement of funds from the client trust account to the IRS, defendants exercised dominion or control over funds that were not their property, and we will deny their motion to dismiss on this point as well.

### e.  Pennsylvania Unfair Trade Practice and Consumer Protection Law

All the defendants also contend that plaintiffs cannot find relief under the Pennsylvania Unfair Trade Practice and Consumer Protection Law, 73 P.S. § 201-1, et seq. (UTPCPL).  Based on the Pennsylvania Supreme Court's recent decision in Beyers v. Richmond, 937 A.2d 1082 (Pa. 2007), we agree.  In Beyers, the Court addressed the question of whether a plaintiff could obtain damages under the UTPCPL from lawyers who had misappropriated money from the settlement of a legal dispute.  The Court found that the defendant-lawyers' "conduct in collecting and distributing settlement proceeds does not fall within the purview of the UTPCPL, but rather within [the] Court's exclusive regulatory powers."  Id. at 1093.  Here, the plaintiffs seek relief under the UTPCPL for their lawyers' misdeeds in "collecting and distributing settlement proceeds."  They therefore cannot find relief under the

29

UTPCPL.  We will grant the motions to dismiss this claim.

### iii.  Joinder of Parties

Defendant Cunningham contends that Stephen Stambaugh and Anita Leviditis must be joined to the case pursuant to Federal Rule of Civil Procedure 19(a).  He argues that Stephen Stambaugh represented plaintiff Strayer in litigating the underlying case and knew of the improper use of the trust account.  Because he was in privity with Strayer and possessed this knowledge of the improprieties, defendant argues that he is a party necessary to the case.  Plaintiffs acknowledge that Leviditis may have known of the improper use of the trust account, and Cunningham insists that she therefore must be joined in the case.

"Under Rule 19(a), the joinder of parties is compulsory or 'necessary' if the joinder is 'feasible.'" General Refractories Company v. First State Ins. Co., 500 F.3d 306, 312 (3d Cir. 2007).  Under that rule:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.  Id. (quoting FED. R. CIV. P. 19(a)).

The Third Circuit Court of Appeals has divided the inquiry under Rule 19(a) into three parts.  First, a court must "ask . . . whether complete relief can be accorded to the parties to the action in the absence of the unjoined party." Janney Montgomery

Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 405 (3d Cir. 1993).  This inquiry focuses solely on those party to the action:  "what effect a decision may have on absent parties is immaterial."  General Refractories, 500 F.3d at 313.  Second, "[n]otwithstanding a determination that complete relief may be accorded to those persons already named as parties to an action, a court still may deem a party 'necessary' under subsection (a)(2) of Rule 19."  Id. at 316.  In such cases, courts look to Rule 19(a)(2)(i) to ask "whether determination of the rights of those persons named as parties to the action would impair or impede an absent party's ability to protect its interest in the subject matter of the litigation."  Id.  Third "under Rule 19(a)(2)(ii) a court must decide whether continuation of the action would expose named parties to the 'substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.'"  Id. at 317 (quoting FED. R. CIV. P. 19(a)(2)(ii)).

Here, defendant claims that Steven Staumbaugh and Anita Leviditis are necessary parties because those persons have an interest in the litigation that they may be unable to protect if not joined.  Apparently, then, defendant points to the second part of this test under Rule 19(a)(2)(i) as grounds for requiring inclusion of Staumbaugh and Leviditis.  Defendant does not explain, however, how these person's interests will be harmed by not being joined as parties.  Instead, he argues that Staumbaugh represented plaintiff Strayer in the litigation that gave rise to his lawsuit, and that Leviditis had knowledge of the improper use of the trust account.

Not joining these two parties will not prevent the existing parties from obtaining complete relief, since the dispute is about the management of the trust account, not Staumbaugh's or Leviditis's control of it.  See Marra v. Burgdorf Realtors, Inc., 726 F.Supp. 1000, 1004 (E.D. Pa. 1989) (finding a person an indispensable party because he claimed ownership in property and "it [was] necessary to determine who owned the properties in question at the times in question.").  Likewise, nothing would prevent the other defendants from seeking contribution from those two defendants after a verdict.  To the extent that defendants feel that Staumbaugh or Leviditis should share in the potential legal liability presented by this action, other procedural remedies are available short of compulsory joinder.  We will therefore deny the motion on this point.

**Conclusion**

For the foregoing reasons, the defendants' motions to dismiss the instant case are granted with respect to the Pennsylvania Unfair Trade Practices and Consumer Protection Law and denied in all other respects.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIAN STRAYER and the** | : | **No. 3:06cv2068** |
| **PENNSYLVANIA LAWYERS FUND** | : | |
| **FOR CLIENT SECURITY,** | : | **(Judge Munley)** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DOUGLAS BARE, ESQ.,** | : | |
| **DARRYL CUNNINGHAM, ESQ.,** | : | |
| **STEPHEN M. FRANKEL,** | : | |
| **FRANKEL & ASSOCIATES and** | : | |
| **WACHOVIA BANK,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 28th day of April 2008, the defendants' motions to dismiss (Docs. 61, 63, 66) are hereby **GRANTED** with respect to plaintiff's claims pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law and **DENIED** in all other respects.  In addition, the stay imposed on this case by Judge Kane (Doc. 48) is hereby lifted.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**UNITED STATES DISTRICT COURT**