**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRIAN STRAYER and THE PENNSYLVANIA LAWYERS FUND FOR CLIENT SECURITY,**<br>　　　**Plaintiffs** : | **No. 3:06cv2068** |
| : | **(Judge Munley)** |
| 　　　　　　**v.** : | |
| **DOUGLAS BARE, ESQ.; DARRYL CUNNINGHAM, ESQ.; and WACHOVIA BANK,**<br>　　　**Defendants** : | |
| : | |
| **DOUGLAS BARE, ESQ. and DARRYL CUNNINGHAM, ESQ.,**<br>　　　**Third-Party Plaintiffs** : | |
| 　　　　　　**v.** : | |
| **STEVEN STAMBAUGH, ESQ. and ANITA LIVADITIS,**<br>　　　**Third-Party Defendants** : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court are defendants' motions for summary judgment (Docs. 146, 149, 151) pursuant to Rule 56 of the Federal Rules of Civil Procedure. Having been fully briefed and argued, the matter is ripe for disposition.

## BACKGROUND

This case stems from the theft and misapplication of entrusted client funds by the York County, PA law firm of Frankel & Associates, P.C. ("the Frankel Firm") run by attorney Mark David Frankel. Plaintiff Brian Strayer was a client of the firm whose settlement proceeds were never distributed to him. Plaintiff Pennsylvania Lawyers Fund for Client Security is a non-profit fund that is subrogated to the claims of twenty-six other clients whose funds were stolen. Plaintiffs' suit seeks to impose liability on Defendants Douglas Bare and Darryl Cunningham, two former associates of the firm, and on Defendant Wachovia Bank, which maintained the firm's Interest on

Lawyer Trust Account ("IOLTA"), for each defendant's alleged role in the scheme.

Mark David Frankel, the firm's sole shareholder, improperly used his firm's IOLTA throughout the 1990s until the scheme was brought to light in October of 2004. (Pl.'s Resp. to Wachovia Bank's Statement of Undisputed Material Facts at ¶ 19 (Doc. 168)). For approximately seven to nine years, in the early 1990s, Frankel would transfer money from the firm's operating account into its IOLTA– in violation of his professional obligations– and then transfer that money from the IOLTA to the IRS to pay the firm's taxes. (Id. at ¶ 21; Livaditis Dep. at 50, 76 to 77 (Doc. 146-5 at 11, 37 to 38); see Rule 1.15 of the Pennsylvania Rules of Professional Conduct). Late in the 1990s, however, the firm began to pay its tax obligations with clients' money without prepaying or repaying from the operating account. (Doc. 168 at ¶ 22). In essence, Frankel operated a Ponzi scheme where proceeds from later settlements were used to pay clients owed under earlier settlements.

Eventually, the IOLTA at times had insufficient funds to distribute settlement proceeds to the firm's clients. Anita Livaditis, the firm's bookkeeper from 1979 to 2004, had a policy of never bouncing a check drawn on the IOLTA, so she would hold off on distributing settlement proceeds to clients, or making IRS payments, until a new settlement check was received. (Pl.'s Answer to Def. Cunningham's Statement of Material Facts at ¶ 8 (Doc. 157); Doc. 168 at ¶¶ 25, 26). Livaditis knew that IOLTA funds were being used to pay the firm's taxes. (Doc. 157 at ¶ 17). Generally, firm policy was that settlement proceeds would not be distributed to clients until three weeks after they were initially received. (Frankel Firm Disbursement Policy (Doc. 157-21)).

On February 3, 1999, Plaintiff Brian Strayer ("Strayer") retained

Third-Party Defendant Steven Stambaugh ("Stambaugh") of the Frankel Firm to represent him in a personal injury claim. (Pl.'s Answer to Def. Bare's Statement of Material Facts at ¶¶ 12, 13 (Doc. 160)). Stambaugh ultimately settled Strayer's personal injury claim for $530,000.00 in September of 2004. (Id. at ¶¶ 14, 15). Strayer had no contact with Defendants Douglas Bare ("Bare"), Darryl Cunningham ("Cunningham"), or Wachovia. (Doc. 157 at ¶ 3; Doc. 168 at ¶ 71). Though Strayer's settlement proceeds were received by the firm, they were never distributed to him. (Doc. 160 at ¶¶ 16, 17). When Stambaugh learned that the IOLTA did not have enough money to cover Strayer's settlement distribution on October 28, 2004, he notified the York County District Attorney. (Id. at ¶ 48).

The subsequent investigation by the Pennsylvania Attorney General's Office ended in the conviction of Mark David Frankel and his son, attorney Stephen Frankel, in 2006. (Id. at ¶¶ 49, 50). Mark David Frankel was tried and convicted of fifty-seven counts of theft and one count of misapplication and sentenced to a term of four years in prison. (See Mem. on Mot. to Dismiss at 3 n.4 (Doc. 90 at 3)). Stephen Frankel was also convicted of theft and misapplication of entrusted funds and sentenced to two years probation. (Id.) At the criminal trial of Mark David Frankel, Steven Stambaugh testified that he considered Bare and Cunningham "active, knowing, participants in the Ponzi scheme." (Criminal Trial Testimony of Steven Stambaugh at 507-08 (Doc. 157-8)). Prior to the revelation of the IOLTA scheme, Mark David Frankel had been disbarred in May of 2004 for sexual improprieties relating to his practice of law and his shares of the professional corporation had transferred to Stephen Frankel. Office of Disciplinary Counsel v. Frankel, 849 A.2d 1133 (Pa. 2004); (Doc. 168 at ¶ 3).

Besides Plaintiff Strayer, the firm failed to pay settlement proceeds to twenty-six other clients.[1]  The Plaintiff Pennsylvania Lawyers Fund for Client Security ("the Fund") refunded these clients, whose claims ranged from $33.33 to $75,000.00, in return for an assignment of rights and a subrogation agreement.  (Doc. 160 at ¶¶ 18, 19; 2d Am. Compl. at ¶¶ 48, 62 (Doc. 60)).  In total, the Fund distributed $767,400.81 to these clients.  (See 2d Am. Compl. at ¶¶ 19 to 70 (Doc. 60)).  The Fund was made aware of the potential claims against the defendants in October of 2004.  (Doc. 160 at ¶ 20; Doc. 157 at ¶ 29).

The firm hired Defendant Bare as an associate in 1985.  (Doc. 160 at ¶ 1).  Bare did not hold any shares of the firm.  (Id.)  According to the plaintiffs, however, Bare eventually "became an equal" of Mark David Frankel within the firm.  (Criminal Trial Testimony of Mark David Frankel at 1225 (Doc. 157-14 at 4)).  Bare did not represent, and had no communications with, Strayer or any of the fund claimants.  (Doc. 160 at ¶ 47).

In 1991 or 1992, the firm received automated clearinghouse ("ACH")

---

[1] These clients were: Christina M. Stark; Michael R. and Carla D. Lehr; Jacqueline G. Gotwols; Daniel J. Miller; Ellen J. Blocher; Rosa Garcia for her minor child, Ninoshka Rivera; Sherrie Grove, parent and natural guardian of Prescilla Grove, a minor; Jeffrey A. Young; Estate of Larry Wilhelm by Althea Craul Administratrix; Shelley W. Kope; Bart E. Frey; Tammy L. Riley; Octavia Hoffman; Michael L. Spahr; Ralph Ebersole; Jean Ebersole; Estate of Chad Livelsberger by Michael R. Livelsberger, Administrator; Mason Fortney, a minor, by Shelly Brown, parent and natural guardian; Robert M. Fisher; David A. Beckwith; Shae Bollinger; Patricia Ann Thompson; Estate of Edwin Castro Galarza by Milagros Galarza, Administratrix; Rockwood Casualty Ins. Co./Front Royal Ins. Co.; Teresa A. Golden; and Richard L. Ohler.  (Doc. 160 at ¶ 21 to 46).

software from the IRS enabling it to pay its tax obligations electronically. (Bare Dep. at 10 (Doc. 151-2 at 7)). Bayer installed this software on Livaditis's computer. (Id.) Livaditis and Mark David Frankel each testified that Bayer designated the IOLTA as the account from which the ACH would transmit payments to the IRS, as opposed to the operating account. (Criminal Trial Testimony of Anita Livaditis at 144, 147 (Doc. 157-6 at 9, 11); Criminal Trial Testimony of Mark David Frankel at 1230 (Doc. 157-14 at 6)). Bayer averred that he only installed the software and modem, and did not know which accounts were being used. (Bare Dep. at 10 (Doc. 151-2 at 7)). At various times in the 1990s, Bare served at least nominally as the secretary, treasurer, and vice president of the professional corporation. (Id. at 29 (Doc. 151-2 at 11)). Bare denies knowing that IOLTA funds were being used to pay the firm's tax obligations. (Bare Dep. at 13 (Doc. 151-2 at 7)).

Defendant Cunningham was another non-shareholding associate at the Frankel Firm. (Doc. 157 at ¶ 35). Cunningham represented one of the fund claimants– Patricia A. Thompson. (Criminal Trial Testimony of Patricia Thompson (Doc. 157-10)). Cunningham settled Thompson's claim in June of 2003, at which time Thompson indicated she preferred not to receive her distribution immediately. (Id.) According to Thompson, Cunningham assured her that her money could be kept in the IOLTA until she wanted it and that it would not be accessible to anyone else. (Id.) Cunningham denies knowing that IOLTA funds were being used to pay the firm's tax obligations. (Cunningham Dep. at 14 (Doc. 146-9 at 7)). Cunningham signed checks payable to the IRS that were drawn on the IOLTA, but did not prepare these checks. (Doc. 157 at ¶ 40; Check Copies (Doc. 157-13)).

According to Livaditis, while some attorneys, such as Steven

Stambaugh, were kept in the dark about the existence of the IOLTA's insufficiencies, others were aware of it, including Bare and Cunningham. (Doc. 168 at ¶ 14). Livaditis states that on numerous occasions Cunningham's clients' funds were short. (Doc. 157 at ¶ 9). Unlike when Stambaugh's clients were short, Livaditis would plainly tell Cunningham that his clients would have to wait to be paid. (Livaditis Dep. at 15 (Doc. 146-4 at 16)). Livaditis testified in Mark David Frankel's criminal trial that Cunningham was told that the deficiencies were due to withdrawals from the IOLTA that went to the IRS. (Criminal Trial Testimony of Anita Livaditis at 229-332 (Doc. 157-6 at 52 to 53)). According to her deposition in this case, however, she never explicitly told Cunningham the cause of the deficiencies. (Livaditis Dep. at 15 to 16 (Doc. 146-4 at 16 to 17)). Cunningham denies that Livaditis would come to him when his clients were due money missing from the escrow account. (Cunningham Dep. at 13 (Doc. 146-9 at 6)).

With respect to Bare, Livaditis testified that, while Cunningham clearly knew about the missing IOLTA funds, Bare only might have known. (Criminal Trial Testimony of Anita Livaditis at 276 to 77 (Doc. 157-6 at 75 to 76)). Livaditis did acknowledge several innocent reasons that a client's settlement proceeds could be delayed, such as untimely insurance checks, settlements from multiple sources, or delayed receipt of a settlement check. (Livaditis Dep. at 15 to 16 (Doc. 146-4 at 16 to 17)). She went on to say, however, that Bare and Cunningham knew that the funds were not missing for innocent reasons, such as the arrival of the settlement check at issue, and that these attorneys knew the shortage would not be resolved until the receipt of a settlement check from another client. (Livaditis Dep. at 17 (Doc. 157-6 at 18)).

Bare resigned from the firm on July 19, 2002. (Doc. 160 at ¶ 11).

Cunningham submitted a resignation letter, dated December 22, 2003, in which he said, "[b]usiness decisions and moral issues have caused conflict with my values and affect my ability to participate in the operation of the firm." (Cunningham Resignation Letter (Doc. 66-2 at 3)).

Defendant Wachovia Bank ("Wachovia") succeeded to First Union, which had succeeded to Corestates Bank, N.A., as the holder of the Frankel Firm's IOLTA. (2d Am. Compl. at ¶¶ 77, 78 (Doc. 60)). It is undisputed that Wachovia made no express agreement with the Frankel Firm to defraud clients of their settlement proceeds. (Doc. 168 at ¶ 32). Wachovia did not know the identities of the firm's clients or to what amount any of them was entitled. (Id. at ¶¶ 42, 43). Wachovia was not involved in the process by which the firm set up its ACH payment mechanism. (Id. at ¶ 60). According to one Wachovia employee, electronic transfers from IOLTAs are common. (Patrick Eley-Durbin Dep. at 39 (Doc. 149-12 at 13)). Wachovia was not aware that the firm was delaying settlement distributions to its clients for twenty-one days. (Id. at ¶ 44).

According to Wachovia employees, the bank does not substantially oversee the activities within its IOLTAs, and conducts only "product level" reviews, as opposed to "individual level" reviews. (Patrick Eley-Durbin Dep. at 18 to 19, 41 (Doc. 149-12 at 8, 13)). The only investigatory action the bank takes with respect to an IOLTA, in particular, is to generate a letter to the offending attorney and to the Pennsylvania Bar Association any time a check drawn on an IOLTA is bounced. (Doc. 168 at ¶ 28). Wachovia was generally aware that IRS payments from an IOLTA would be improper. (Elizabeth Torres Dep. at 16 (Doc. 149-21 at 13)).

In 2001 or 2002, Mark David Frankel's personal loans were moved from the private banking area of Wachovia to the special assets group because the loans "were getting slow pay." (Patrice Hoenninger Dep. at 19

7

to 20 (Doc. 149-22 at 8)).  At least one Wachovia employee was aware of the lawsuits and newspaper articles between 1999 and 2002 involving Mark David Frankel's sexual improprieties.  (Elizabeth Torres Dep. at 10 (Doc. 149-21 at 9)).  Another Wachovia employee stated that if Wachovia is aware that a customer has been accused or convicted of a crime that could put one of its loans at risk, the bank may put an alert on that customer's accounts.  (Jan Heller Dep. at 22 to 23 (Doc. 149-13)). Plaintiffs' banking expert, Stuart Greenberg, opines that by failing to detect the IRS payments Wachovia recklessly disregarded standards in the banking industry and committed gross negligence.  (Greenberg Letter of March 2, 2009 (Doc. 157-4)).

Plaintiff Strayer filed his complaint in this court on October 20, 2006. (Doc. 1).  The case was first assigned to Chief Judge Yvette Kane.  After being served with the complaint, Defendant Cunningham filed a motion to dismiss.  (Doc. 9).  Before the other parties could respond, plaintiffs filed an amended complaint.  (Doc. 15).  Defendants Wachovia Bank, Darryl Cunningham and Douglas Bare filed motions to dismiss this amended complaint.  (Docs. 17, 20, 26).  On January 11, 2007, plaintiffs then filed a motion for leave to file a second amended complaint, which included the Fund as plaintiff.  (Doc. 46).  On April 16, 2007, Judge Kane issued an order granting plaintiffs' motion to file a second amended complaint and denying defendants' motions to dismiss as moot.  (Doc. 59).  Plaintiffs filed their second amended complaint, and the defendants again filed motions to dismiss it.  (Docs. 60, 61, 63, 66).  On October 3, 2007, Judge Kane determined that she had a conflict of interest and removed herself from the case.  (Doc. 81).  On October 10, 2007, the case was reassigned to the undersigned judge.

Plaintiffs' second amended complaint (Doc. 60) raises seven counts.

Count I, raised against all defendants except the firm, contends that defendants' conduct violated 18 U.S.C. §§ 1962(c)-(d), the Racketeer Influenced and Corrupt Organizations Act (RICO). Count II claims fraud against all of the defendants. Count III alleges a breach of fiduciary duty against the individual defendants. Count IV, raised against all defendants except the firm, claims a conspiracy. Count V, raised against Wachovia Bank, alleges a breach of the duty of good faith and acting in bad faith pursuant to the Uniform Fiduciaries Act. Count VI claims conversion against all of the defendants. Count VII raises a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law against all of the defendants except Wachovia Bank.

Defendants Bare, Cunningham, and Wachovia each filed motions to dismiss plaintiffs' second amended complaint. (Docs. 63, 66, 61). On April 28, 2008 this court granted the motions with respect to plaintiffs' Pennsylvania Unfair Trade Practices and Consumer Protection Law count, and denied them in all other respects. (Doc. 90). On June 2, 2008, this court granted default judgment against Defendants Stephen M. Frankel and Frankel & Associates, P.C. (Doc. 105). Defendants Bare and Cunningham filed a third-party complaint against Third Party Defendants Anita Livaditis and Steven Stambaugh on August 11, 2008. (Doc. 120). These third-party defendants answered on October 1 and 21, 2008, respectively. (Docs. 122, 125).

Defendants Cunningham, Bare, and Wachovia have separately moved for summary judgment on the remaining six counts of plaintiffs' second amended complaint. (Docs. 146, 151, 149). The parties have briefed and argued the motions for summary judgment, bringing the case to its present posture.

**JURISDICTION**

Because this case arises under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964, we have jurisdiction pursuant to 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). We have supplemental jurisdiction over the plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

**LEGAL STANDARD**

The granting of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

When considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's

burden of proof at trial.  <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986).
Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. <u>Id.</u> at 324.

**DISCUSSION**

Defendants move for summary judgment on all of plaintiffs' claims. We will first address plaintiffs' federal claims and then plaintiffs' state-law claims.

**A.  Federal Claims**

Defendants contend that plaintiffs have not demonstrated a genuine issue of material fact on either of their RICO claims.  We will address each claim in turn.

### i. RICO Violation

To state a civil claim for a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise  (3) through a pattern (4) of racketeering activity."  <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 496 (1985).  The enterprise in this case is the Frankel Firm.  (Doc. 168 at ¶ 1).

The "conduct" element of a RICO violation requires some participation in the "operation or management" of the affairs of the enterprise.  <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 179 (1993).  However, while the defendant must have played some role in directing the enterprise's affairs, a demonstration of "significant control" is not required. <u>Id.</u> at 179 n.4.  <u>Cf.</u> <u>Univ. of Maryland at Baltimore v. Peat, Marwick, Main & Co.</u>, 996 F.2d 1534, 1539 (3d Cir. 1993) ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result.  There must be a nexus

11

between the person and the conduct in the affairs of an enterprise.").

"A pattern of racketeering activity requires at least two predicate acts of racketeering," and "may include, *inter alia*, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343." Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004). The plaintiffs here allege that the defendants engaged in federal mail and wire fraud in relation to the misappropriation of settlement funds. (2d Am. Compl. at ¶ 105). "The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud." Lum, 361 F.3d at 223 (citing 18 U.S.C. §§ 1341, 1343). A plaintiff must establish "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." United States v. Antico, 275 F.3d 245, 261 (3d Cir. 2001) (citing United States v. Clapps, 732 F.2d 1148, 1152 (3d Cir. 1984)). "A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 528 (3d Cir. 1998) (quotations and citations omitted).

The evidence, read in a light most favorable to the plaintiffs, establishes a genuine issue of material fact as to whether Defendant Bare violated section 1962(c). Bare was an employee of the Frankel Firm, described by Mark David Frankel as "an equal." Though Bare may not have had as much control over the enterprise as Mark David Frankel, a reasonable jury could find that Bare participated in the operation of the enterprise, beyond merely providing goods and services. According to Livaditis, Bare set up the ACH software to make payments to the IRS from

12

the IOLTA, thus implicating the wire fraud statute. She also states that Bare knew that the IOLTA was short of funds and did not protest the delay of his clients' distributions. A reasonable jury could find that, by continuing to allow his clients' settlements to be deposited in the account, Bare was wilfully participating in the scheme. Similarly, a reasonable jury could infer Bare's intent to defraud from the facts indicating the duration of Bare's participation in the alleged scheme to defraud the firm's clients. Though Bare contends that the offices he held were meaningless formalities, a reasonable jury could find otherwise. Finally, Steven Stambaugh testified that Bare actively participated in this ponzi scheme. Therefore, plaintiffs have established a genuine issue of material fact as to whether Bare violated section 1962(c) of the RICO Act. Summary judgment is inappropriate on this claim against Bare.

For the same reasons, a reasonable jury could find that Defendant Cunningham violated section 1962(c) of the RICO Act. Cunningham was a member of the Frankel Firm, and thus the enterprise. A reasonable jury could conclude that Cunningham knew that the IOLTA was deficient and that some of his clients were paid their settlements from proceeds originating with other client settlements. By allowing his clients' settlements to be deposited in the account, Cunningham wilfully participated in the scheme. As with Bare, a reasonable jury could infer Cunninhgam's intent to defraud from the duration of Cunningham's participation in the alleged scheme to defraud the firm's clients. Finally, Stambaugh testified that Cunningham participated in the Ponzi scheme. These facts would permit a reasonable jury to conclude that Cunningham was involved in the scheme by which IOLTA funds were wired to the IRS. A reasonable jury could also find that Cunningham signed the payments to the IRS drawn on the firm's IOLTA and could infer an intent to defraud from

13

that action.  Therefore, summary judgment in favor of Defendant Cunningham is inappropriate.

However, Defendant Wachovia, unlike Bare and Cunningham, was not a member of the Frankel Firm.  Its relation to the enterprise is, therefore, more tangential.  Plaintiffs show no facts indicating that Wachovia participated in the "operation or management" of the Frankel Firm.  Rather, the facts indicate that Wachovia provided a service that benefitted the firm.  See Univ. of Maryland at Baltimore, 996 F.2d at 1539.  Furthermore, plaintiffs point to no facts showing "knowing and willful participation" in a scheme to defraud the firm's clients.  Plaintiffs largely argue that Wachovia should have discovered the firm's scheme, or should have prevented the firm's transfers.  Plaintiffs have shown no facts indicating that Wachovia knew of the transfers of money from the firm's IOLTA to the IRS.  Instead, the facts show that these automated transfers were performed independently by the firm, and that, at most, Wachovia negligently allowed them.  No facts demonstrate that Wachovia made a fraudulent misrepresentation or omission sufficient to establish a predicate act of racketeering.  Similarly, plaintiff presents no facts from which a reasonable jury could infer a specific intent to deceive the firm's clients.  In summary, plaintiffs have not established a material issue of fact as to whether Wachovia violated the RICO Act, and summary judgment will be granted in its favor on this claim.

### ii.  RICO Conspiracy

Defendants likewise argue that plaintiffs have not presented a genuine issue of material fact as to a conspiracy to violate the RICO Act. 18 U.S.C. § 1962(d).  Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  A defendant, however, need not have personally

14

violated any of these predicate subsections in order to be liable under (d), because "one who opts into or participates in a conspiracy is liable for the acts of his co-conspirators which violate section 1962(c) even if the defendant did not personally agree to do, or to conspire with respect to, *any* particular element." Smith v. Berg, 247 F.3d 532, 537 (3d Cir. 2001). Further, "a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise." Id. at 538.

Here, plaintiffs have established a genuine issue of material fact as to whether Defendants Bare and Cunningham conspired to violate section 1962(c). A reasonable jury could find, based on Livaditis' statements, that Bare and Cunningham knew of the IOLTA's deficiency and payment of tax obligations from the account. A reasonable jury could also find that each lawyer agreed to delay his clients' settlement distributions until other proceeds were received, facilitating and perpetuating the scheme. Summary judgment in favor of Defendant Bare or Cunningham is, therefore, inappropriate.

No genuine issue of material fact exists, however, as to whether Defendant Wachovia knowingly agreed to promote the scheme to defraud clients of the Frankel Firm. The record demonstrates that Wachovia did not as a matter of course examine the payments made to and from IOLTAs. The only event which would alert Wachovia would have been a check returned for insufficient funds. In that case, Wachovia would issue a letter to the offending lawyer and the bar association. However, because of the firm's rigorous adherence to its scheme, none of its checks ever bounced. Because plaintiffs cannot show that Wachovia agreed to facilitate the firm's scheme to defraud its clients, summary judgment in favor of Wachovia is appropriate on plaintiffs' RICO conspiracy claim.

15

## B. State-law Claims

Defendants seek summary judgment on the merits of plaintiffs' state-law claims. In addition, defendants assert various defenses as bases for summary judgment. We will address the defenses preliminarily, and then proceed to each of plaintiffs' remaining state-law claims.

### i. Defendants' Statute of Limitations Defense

This court has already determined that a two-year statute of limitations governs plaintiffs' state-law claims because they are based on tort law. (See Mem. on Mot. to Dismiss at 15 (Doc. 90 at 15) (citing 42 PA. CON. STAT. § 5524(7))). We noted that because a subrogee "stands in the [subrogor's] shoes" the subrogee's "timeliness in petitioning to intervene is measured by the statute of limitations as it accrues against the" subrogors. Holloran v. Larrieu, 637 A.2d 317, 322 (Pa. Super. Ct. 1994). Thus, the timeliness of the Fund's claims is determined by the timeliness of the individual fund claimants' claims.[2] This court did not grant dismissal of any of plaintiffs' claims, noting that plaintiffs had alleged facts from which a jury could determine that plaintiffs' claims were timely. We also noted that the discovery rule or minority tolling statute might apply to save otherwise untimely claims. Defendants Bare and Wachovia renew their arguments that plaintiffs' state-law claims are barred by the statute of limitations.

The Fund, as an arm of the Pennsylvania judiciary, argues that no statute of limitations applies to it under the doctrine of *nullum tempus occurrit regi* ("no time runs against the king"). However, according to the United States Court of Appeals for the Third Circuit, interpreting Pennsylvania case-law, "[it] is clear that *nullum tempus* applies when a

---

[2]    Defendants do not argue that the statute of limitations bars Plaintiff Strayer's claims.

government entity sues to enforce a statutory obligation imposed upon a defendant, and the claim is one which by its nature can accrue only to the government." City of Philadelphia v. Lead Industries Ass'n, Inc., 994 F.2d 112, 120 (3d Cir. 1993). The common-law tort claims brought here by the Fund, however, are not peculiar to the government–they can be brought by any private litigant. See id. Therefore, the doctrine of *nullum tempus* is unavailable to the Fund, and the statute of limitations must be analyzed.

### a. Minority Tolling Statute

Defendants Bare and Wachovia argue that the minority tolling statute, 42 PA. CON. STAT. § 5533(b), should not preserve any of the Fund's claims. This statute tolls any applicable statute of limitations if an unemancipated claimant was under the age of eighteen when his claim accrued until the claimant reaches the age of eighteen. Id. at (b)(1).

This court has already determined that "since the Lawyer's Fund is the subrogee for minor plaintiffs' claims against defendants, the Lawyer's Fund has the advantage of the statute of limitations supplied by the minor tolling statute for those claims." (See Mem. on Mot. to Dismiss at 23 (Doc. 90 at 23) (citing U.S. Steel Homes Credit Corp. v. South Shore Dev. Corp., 419 A.2d 785, 788 (Pa. Super. Ct. 1980) for the proposition that subrogation gives the subrogee not only the right to enforce the subrogor's claim, but also any means to enforce that right which the subrogor could have used)).

Applying the minority tolling statute in this case, if any of the fund claimants were under the age of eighteen at the time their claims accrued, the two-year statute of limitations for torts does not run until they reach eighteen. 42 PA. CON. STAT. § 5533(b)(1). The Fund brings three claims on behalf of minors. These claimants are Rosa Garcia for her minor child, Ninoshka Rivera (age seventeen); Sherrie Grove for her minor child,

17

Prescilla Grove (age twelve); and Shelly Brown for her minor child, Mason Fortney (age nine). (Statements of Claim (Docs. 151-5 at 2; 151-6 at 16, 22)). The only claim which is close to being barred by the statute of limitations is that of Ninoshka Rivera. According to her statement of claim, she was seventeen as March 8, 2005. (Statement of Claim (Doc. 151-6 at 22)). Though the court does not know her birthday, even if she turned eighteen the next day, her claim would not be barred since the Fund filed its claims on January 11, 2007, within two years of the date she hypothetically reached majority. Thus, the statute of limitations does not bar state-law claims brought by the Fund on behalf of these three claimants.

### b. Discovery Rule

Defendants argue that summary judgment is appropriate with regard to all of the fund claimants who were aware of their loss more than two years before the Fund filed suit. Normally, the statute of limitations on a tort claim begins to run the moment the plaintiff is injured, but "where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible." Dalrymple v. Brown, 701 A.2d 164, 167 (Pa. 1997); see also Fine v. Checcio, 870 A.2d 850, 859 (Pa. 2005) (finding that when the discovery rule applies, the statute of limitations begins to run when plaintiff knows or reasonably should know of his injury and its cause).

The discovery rule is applicable to the fund claimants. The moment of injury, which normally determines when the statute of limitations begins to run, is unknown for the individual fund claimants in this case. Absent an expedition in forensic accounting, which the parties have not attempted, it

would be impossible to tell which clients' dollars were siphoned from the IOLTA first, or in what amount, and therefore impossible to know when each individual claimant was actually injured.  Furthermore, it is reasonable to expect a client to trust the firm representing him, by virtue of his attorney's fiduciary duty, and therefore reasonable for him to take longer than average to discover his injury.  Thus, the fund claimants are entitled to the benefit of the discovery rule.

On April 16, 2007 the Fund, along with Plaintiff Strayer, filed its amended complaint.  However, Strayer moved for leave to amend his complaint to include the Fund as a plaintiff earlier, on January 11, 2007.  Therefore, because the timeliness of the Fund's claims is measured against that of the individual claimants, if any of the individual claimants knew or should reasonably have known of his injury before January 11, 2005, that claim would be barred.[3]  The "Statements of Claim" filled out by each fund claimant ask for the "Date and Circumstance when [the claimant] First Discovered [his] Alleged Loss."  (See Statements of Claim (Docs. 151-5 to 151-8)).  Of the twenty-six fund claimants, three are saved from the statute of limitations by the minority tolling statute, as discussed previously.  Of the remaining twenty-three claimants, thirteen stated that

---

[3]     Wachovia argues that because many claimants knew of their injury in late 2004, when Mark David Frankel's crimes were publicized, all of the fund claimants should reasonably have known of their injury at that time.  The court declines to follow this logic for the same reason we find that the discovery rule is applicable– it is reasonable to expect a client to trust the firm representing him and therefore reasonable for him to take longer than average to discover his injury.

they learned of their loss before January 11, 2005.[4]  Therefore, defendants'
motion for summary judgment will be granted on the Fund's state-law
claims brought on behalf of these thirteen claimants.  The Fund's
remaining ten claims which are not barred by the statute of limitations are
those it brings on behalf of Christina M. Stark, Ellen J. Blocher, Jeffrey A.
Young, Octavia Hoffman, Michael L. Spahr, Ralph Ebersole, Jean
Ebersole, Shae Bollinger, Teresa A. Golden, and Richard L. Ohler.[5]

### ii. Wachovia's IOLTA Statute Defense

Defendant Wachovia argues that the Interest on Lawyers' Trust
Accounts Act ("IOLTA Act") releases it from liability and provides a
complete defense on plaintiffs' state-law claims.  62 PENN. STAT.  §§
4021–31.  We agree.

The parties have not cited any case analyzing this subsection and

---

[4]   The adult claimants with claims predating January 11, 2005 are:
Michael R. and Carla D. Lehr, November 5, 2004; Jacqueline G.
Gotwols, November 30, 2004; Daniel J. Miller, November 4, 2004;
Estate of Larry Wilhelm by Althea Craul Administratrix, November
2004; Shelley W. Kope, November 2, 2004; Bart E. Frey, November
2004; Tammy L. Riley, October 2004; Estate of Chad Livelsberger by
Michael R. Livelsberger, Administrator, October 31, 2004; Robert M.
Fisher, October 27, 2004; David A. Beckwith, November 16, 2004;
Patricia Ann Thompson, October 30, 2004; Estate of Edwin Castro
Galarza by Milagros Galarza, Administratrix, November 2004; and
Rockwood Casualty Ins. Co./Front Royal Ins. Co., December 28,
2004.  (Statements of Claim (Docs 151-5 to 151-8)).

[5]   Fund claimants Shae Bollinger and Richard Ohler do not indicate the
date or month when they discovered their loss.  Reading their
statements of claim in a light most favorable to the Fund, nothing
indicates that they discovered or reasonably should have discovered
their injuries before January 11, 2005.  Therefore, summary judgment
will be denied with respect to these two claims.

our research has uncovered none.  Therefore, we must interpret and apply the Act as we predict the Pennsylvania Supreme Court would.  U.S. Underwriters Ins. Co. v. Liberty Mutual Ins. Co., 80 F.3d 90, 93 (3d Cir. 1996).  Subsection 4026(d) of the IOLTA Act provides that "[p]ayment from an IOLTA account to or upon the order of the attorney maintaining the account shall be a valid and sufficient release of any claims by any person or entity against any depository institution for any payments so made."  The plain language of the statute, therefore, releases Wachovia from liability.

For the release from liability to apply, payment must be made from an IOLTA and it must be made upon the order of the attorney maintaining the account.  In the instant case, the parties agree that the payments were made from an IOLTA account.  The plaintiffs seem to dispute that the payments were made upon the order of the attorney maintaining the account.  Plaintiffs argue that only Mark David Frankel maintained the account.  Since he was disbarred in June 2004, plaintiffs contend that subsequent payments could not have been "upon the order of the attorney maintaining the account" and that Wachovia remains liable, despite the IOLTA Act.  Id.  We disagree.[6]

Plaintiffs have submitted no evidence that Frankel ordered any payments after his disbarrment.  In fact, it appears that the account was not maintained by Frankel alone, but by the firm itself.  The Act clearly contemplates such situations.  It defines "attorney" as, "[an] individual attorney, partnership, professional association or professional corporation engaged in the practice of law."  62 PENN. STAT. § 2023.  Indeed, the

---

[6]     The Fund argues that the doctrine of *nullum tempus occurrit regi* defeats Wachovia's IOLTA Act defense.  As explained above, this doctrine is not applicable to the Fund's claims in this case.

21

plaintiffs admit that the IOLTA was maintained by the firm, not solely by Mark David Frankel.  (See e.g. Doc. 168 at ¶¶ 19 to 21).  No evidence has been presented that the payments were made without the order of the attorney maintaining the account– the Frankel Firm.  Therefore, the statute applies and Wachovia bank is entitled to a release from any claims because it made payments only upon the order of the attorneys of the firm maintaining the account.  Summary judgment will be granted in favor of Defendant Wachovia Bank on all of plaintiffs' state-law claims.

### iii. Wachovia's Uniform Fiduciaries Act Defense

Though we grant Wachovia summary judgment based on the IOLTA statute, the court will also examine the merits of Wachovia's Uniform Fiduciaries Act ("UFA") defense as an alternative theory.  7 PENN. STAT. §§ 6351 to 6404.  Count V of plaintiffs' second amended complaint raises a bad faith claim under the UFA against Defendant Wachovia.  Wachovia argues that the UFA, as an affirmative defense, entitles it to summary judgment on all of plaintiffs' state-law claims because it meets the "good faith" standard prescribed by the act.  Noting that the ultimate issue of whether or not Wachovia has met the "good faith" standard is identical, regardless of the approach, we will frame the issue as an affirmative defense.[7]

_____

[7]  Although the Pennsylvania Supreme Court has not ruled on the issue, lower Pennsylvania courts and federal courts in other districts have concluded that the UFA creates an affirmative cause of action for bad faith.  See Sonders v. PNC Bank, N.A., No. CIV.A. 01-3083, 2003 WL 22310102 at *5 (E.D. Pa. June 3, 2003) (citing Schwartz v. Pierucci, 60 B.R. 397 (E.D. Pa. 1986) and Manfredi v. Dauphin Deposit Bank, 697 A.2d 1025 (Pa. Super. Ct. 1997) in determining that section 3672 creates a cause of action for bad faith).  We need not follow that approach because, unlike the defendants in the cases

"The very purpose of the Uniform Fiduciaries Act was to facilitate banking transactions by relieving a depository, acting honestly, of the duty of inquiry as to the right of its depositors, even though fiduciaries, to check out their accounts." Davis v. Pennsylvania Co. for Insur. on Lives and Granting, 12 A.2d 66, 69 (Pa. 1940). Specifically, Wachovia relies on section 6391 of the UFA which states, in relevant part:

> [i]f a deposit is made in a bank to the credit of a fiduciary as such, the bank is authorized to pay the amount of the deposit, or any part thereof, upon the check of the fiduciary signed with the name in which such deposit is entered, without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith.
> 7 PENN. STAT. § 6391.[8]

Wachovia argues that all of the deposits in the Frankel Firm's IOLTA were to the credit of the firm, as fiduciary. Therefore, Wachovia was entitled to pay up to the amount of those deposits from the IOLTA upon authorization by the firm, without incurring liability, unless (1) Wachovia knew that the firm's attorneys were breaching their fiduciary duties by drawing the check

_____

just referenced, Wachovia has raised the statute as a defense.

[8]    Plaintiffs argue that section 6361, not 6391, governs Wachovia's actions in this case. That section provides, "a person who, in good faith, pays or transfers to a fiduciary any money or other property, which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary. . . ." 7 PENN. STAT. § 6361. Plaintiffs argue that Wachovia is ineligible for immunity because it transferred money to the IRS, not to an authorized fiduciary. To some extent, plaintiffs are correct– section 6361 does not immunize Wachovia's actions– but other sections of the UFA might. Therefore, the court will examine Wachovia's argument based on section 6391.

or (2) the circumstances show that Wachovia acted in bad faith by paying the checks.  Plaintiffs do not argue that Wachovia had actual knowledge that members of the Frankel Firm were breaching their obligations as fiduciaries.  Thus, we must only address whether Wachovia's conduct failed the good faith standard.[9]

Under the UFA, "[a] thing is done 'in good faith' . . . when it is in fact done honestly, whether it be done negligently or not."  7 PENN. STAT. § 6351(2).[10]   Robinson Protective Alarm Co. v. Bolger & Picker, et al. is an example of a bank which was negligent but afforded good faith immunity under the UFA.  516 A.2d 299 (Pa. 1986).  There, an attorney embezzled nearly $350,000.00 from the firm's escrow account.  Id. at 301.  The attorney was one of three partners with authority to make deposits and withdrawals to and from the account, upon his signature.  Id.  The bank allowed the attorney to draw two checks to an investment firm and one check to the law firm merely upon his oral instructions, instead of upon his signature.  Id.

The Supreme Court of Pennsylvania concluded that the bank had not breached the good faith requirement of the UFA in following the attorney's instructions.  Id. at 305.  The court acknowledged that, "the UFA does not

---

[9]     Wachovia asserts, and plaintiffs do not dispute, that the Uniform Electronic Transactions Act affords the electronic ACH payments at issue here the same protection under the UFA as other transactions. 73 PENN. STAT. § 2260.101 to 2260.105; see e.g. Richards v. Platte Valley Bank, 866 F.2d 1576, 1579-80 (10th Cir. 1989) (concluding that wire transfers are analogous to checks for purposes of the UFA).

[10]    Though its definition of good faith refers to neglience, UFA immunity is not limited to tort claims.  See Robinson Protective Alarm Co., 516 A.2d at 304.

permit a bank to ignore an irregularity where it is of a nature to place one on notice of improper conduct by the fiduciary. In such a case the good faith test would not be met." Id. at 303. The court clarified, however, that to give full effect to the statute, "[e]ven a failure to inquire under suspicious circumstances will not negate 'good faith,' unless the failure to do so is due to a deliberate desire to evade knowledge[.]" Id. at 304.

A non-binding example of bad faith, sufficient to deny a bank's motion for summary judgment, is found in the case of New Jersey Title Ins. Co. v. Caputo, 748 A.2d 507 (N.J. 2000). There, an attorney kept both a business account and an escrow account with a bank. Id. at 509. The bank knew that the attorney gambled extensively and that he had overdrawn his business account. Id. The bank allowed him to make repeated cash withdrawals from the trust account, totaling $291,000.00, yet failed to issue the requisite IRS cash transaction reports. Id. Finally, the bank closed his business account, but allowed him to withdraw another $25,000 from his trust account. Id. at 509. An expert in that case opined that the bank's conduct amounted to willful ignorance. Id. at 510. The Supreme Court of New Jersey found, given the bank's near-complicitous failure to intervene, that a material question of fact was raised as to a bank's bad faith.

Having examined the statute and interpretative case-law, we must determine whether the circumstances in this case were sufficient to put Wachovia on notice of the firm's improper conduct or were such that Wachovia remained ignorant only by deliberate effort. In this case, taking all inferences in favor of the plaintiffs, a reasonable jury could find: (1) the Frankel Firm maintained the IOLTA as fiduciary of their clients; (2) no Wachovia employees actually knew that the Frankel Firm was violating its fiduciary obligations; (3) Wachovia employees knew that sexual

25

misconduct lawsuits were pending against Mark David Frankel; (4) Wachovia transferred Mark David Frankel's personal loans from "private banking" to "special assets" because of slow payment; (5) if Wachovia knows that a customer is accused of a crime that might increase the bank's risk, the bank may put an alert on that customer's accounts; (6) Wachovia did not put an alert on the Frankel Firm's IOLTA; (7) Wachovia knew that payments made directly from an IOLTA to the IRS would be improper; (8) if Wachovia had examined the Frankel Firm's IOLTA they would have seen payments made directly to the IRS; (9) Wachovia conducts product-level reviews of IOLTAs, but no in-depth reviews are made of individual IOLTAs; (10) Wachovia had the ability to examine the Frankel Firm's IOLTA but did not do so; (11) no checks drawn on the Frankel Firm's IOLTA were ever returned to Wachovia for insufficient funds; (12) plaintiffs' banking expert, Stuart Greenberg, said Wachovia recklessly disregarded standards in the banking industry and was grossly negligent.

The circumstances here indicate that Wachovia acted in good faith. There is no genuine issue of material fact as to whether Wachovia ignored any irregularity sufficient to put it on notice of the Frankel Firm's misconduct.  Unlike the overdrawn operating account and repeated suspicious cash withdrawals by an attorney with a gambling problem in Caputo, Frankel's irregularities were non-financial.  No checks drawn on the Frankel Firm's IOLTA ever bounced.  Further, though Mark David Frankel's disbarment for sexual impropriety might have given Wachovia pause as to whether his personal loans might be in risk of default due to loss of income, the disbarment would not have put Wachovia on notice of the Ponzi scheme relating to the firm's IOLTA.

The fact that plaintiffs' expert labeled Wachovia's behavior "grossly

negligent" is insufficient to establish bad faith under the UFA absent a showing that Wachovia failed to inquire out of a "deliberate desire to evade knowledge." Robinson Protective Alarm Co., 516 A.2d at 304. The bank in Caputo allowed the attorney to make cash withdrawals in an amount and frequency that required transaction reports to the IRS. That bank did not generate the reports and continued to allow such withdrawals, clearly supporting the expert's opinion that the bank was willfully ignorant. Here, Wachovia never failed to issue any reports, never failed to respond to an alert, and did nothing to avoid knowing about the Frankel Firm's scheme. Thus, although plaintiffs' expert considers Wachovia "grossly negligent," the bank is not liable. At most, the facts allow a reasonable jury to find "a failure to inquire under suspicious circumstances," which amounts to negligence, and is insufficient to show bad faith absent a deliberate effort to evade knowledge. Id. Therefore, summary judgment in favor of Wachovia is appropriate under the UFA.

### iv. Plaintiffs' Fraud Claim

Defendants argue that plaintiffs have not demonstrated a genuine issue of material fact as to whether defendants engaged in fraud. Fraud is "anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." Walter v. Magee Women's Hosp. of UPMC Health Sys., 876 A.2d 400, 406 (Penn. Super. Ct. 2005) (internal quotations and citations ommited). A tort action for intentional misrepresentation or fraud requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury

27

was proximately caused by the reliance." <u>Gibbs v. Ernst</u>, 647 A.2d 882, 889 (Pa. 1994).

No genuine issue of material fact exists as to whether Defendants Bare or Cunningham made any material representation to either Strayer or the Fund. Neither Bare nor Cunningham communicated with Strayer at any point. Regarding the Fund, Defendant Bare did not represent or communicate with any of its claimants. Defendant Cunningham did represent one of its claimants– Patricia A. Thompson. However, summary judgment has been granted on the Fund's claims on behalf of Ms. Thompson based on the statute of limitations, as explained above. Cunningham did not represent or communicate with any other fund claimant. Therefore, summary judgment is appropriate on plaintiffs' fraud claims against Defendants Bare and Cunningham.

Additionally, to the extent that plaintiffs' allege a claim of intentional non-disclosure, summary judgment would be appropriate in favor of Defendants Bare and Cunningham on that claim as well. "The tort of intentional non-disclosure has the same elements as the tort of intentional misrepresentation except that in a case of intentional non-disclosure the party intentionally conceals a material fact rather than making an affirmative misrepresentation." <u>Gibbs v. Ernst</u>, 647 A.2d 882, 889 n.12 (Pa. 1994). Though active concealment can be fraud, mere silence is not, absent a duty to speak. <u>Smith v. Renaut</u>, 564 A.2d 188, 192 (Pa. Super. Ct. 1989). Plaintiffs' claim, if raised, would fail because there was no "transaction at hand" between the defendants and plaintiffs– they never met or spoke. <u>See</u> <u>Gibbs</u>, 647 A.2d at 889; Restatement (Second) of Torts § 551 (1977) (indicating that liability for non-disclosure is generally predicated on the existence of a transaction between the parties where some representations are made). Therefore, summary judgment in favor

28

of defendants would still be appropriate, whether plaintiffs' claim is based on either a misrepresentation or on intentional non-disclosure.

### v. Plaintiffs' Breach of Fiduciary Duty Claim

Defendants Bare and Cunningham contend that plaintiffs have not established a genuine issue of material fact as to whether they, as attorneys, breached their fiduciary duties to their clients.  In Pennsylvania, the "common law imposes on attorneys the status of fiduciaries *vis a vis* their clients; that is, attorneys are bound, at law, to perform their fiduciary duties properly."  Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, 602 A.2d 1277, 1283 (Pa. 1992).  In order to claim a breach of fiduciary duty, the plaintiff must "establish that a fiduciary or confidential relationship existed" with the defendant.  Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 393, 414 (E.D. Pa. 2006).  Such a relationship exists, "whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest."  Silver v. Silver, 219 A.2d 659, 662 (Pa. 1966).  In addition to the existence of a fiduciary relationship, a plaintiff must establish "(1) [t]hat the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) [t]hat the plaintiff suffered injury; and (3) [t]he defendant's failure to act solely for the plaintiff's benefit was a real factor bringing about plaintiff's injuries."  Baker, 440 F. Supp. 2d at 414-15.

There is no genuine issue of material fact as to whether Defendants Bare or Cunningham had a fiduciary or confidential relationship with Strayer or the Fund.  Neither attorney represented or communicated with Plaintiff Strayer, therefore they could not have occupied "a position of advisor or counselor" towards him.  Regarding the Fund, Defendant Bare did not represent, or communicate with, any of its claimants, precluding a

finding that a fiduciary or confidential relationship existed among them. The same reasoning applies to Defendant Cunningham, given that the Fund's claims on behalf of Patricia A. Thompson are barred by the statute of limitations. Therefore, summary judgment is appropriate on plaintiffs' breach of fiduciary duty claims against Defendants Bare and Cunningham.

### vi. Plaintiff's Civil Conspiracy Claim

Defendants argue that plaintiffs have not presented a genuine issue of material fact as to whether defendants engaged in a civil conspiracy. In Pennsylvania, "[t]o prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979). Further, a plaintiff must show "[p]roof of malice, i.e., an intent to injure," and the "unlawful intent must be absent justification." Id.; see also Skipworth v. Lead Indus. Assoc., Inc., 690 A.2d 169, 174 (Pa. 1997) (holding that to prevail on a civil conspiracy claim a plaintiff must show that defendants "acted in concert to commit an unlawful act or do a lawful act by unlawful means, and that they acted with malice.").

Plaintiffs have established a genuine issue of material fact as to whether Defendants Bare and Cunningham engaged in a civil conspiracy. A reasonable jury could find that Bare and Cunningham agreed to do unlawful acts. As the court explained above regarding plaintiffs' RICO conspiracy claim, a jury could find that Bare and Cunningham knew that the IOLTA was deficient and that tax obligations were being paid from the account. A reasonable jury could also find that each lawyer agreed to delay his clients' settlement distributions until other proceeds were received, thus facilitating and perpetuating the scheme. A reasonable jury could infer an intent to injure the firm's clients from those same facts. For

30

these reasons, summary judgment is inappropriate on plaintiffs' civil conspiracy claims.

### vii. Plaintiffs' Conversion Claim

Defendants argue that plaintiffs have not presented a genuine issue of material fact as to whether defendants are liable for conversion. Pennsylvania courts have defined "conversion as an act of willful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession." Norriton E. Realty Corp. v. Cent.-Penn Nat'l Bank, 254 A.2d 637, 638 (Pa. 1969). "Money may be the subject of conversion." Shonberger v. Oswell, 530 A.2d 112, 114 (Pa. Super. Ct. 1987). A defendant need not engage in "conscious wrongdoing," but can be liable for conversion through "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'" Id. (quoting Prosser, TORTS § 15 (2d ed. 1955)).

There is a genuine issue of material fact as to whether Defendant Cunningham converted the plaintiffs' settlement proceeds. A reasonable jury could find that Cunningham signed checks transmitting payment from the firm's IOLTA to the IRS. This wilful act would constitute an exercise of dominion and control over the plaintiffs' chattel inconsistent with plaintiffs' ownership. Defendant Cunningham's motion for summary judgment on plaintiffs' conversion claim will be denied.

Similarly, there is a genuine issue of material fact as to whether Bare took a wilful act which interfered with plaintiffs' right to possess their settlement proceeds. Though Bare did not sign checks which might have drawn on plaintiffs' money to pay IRS obligations, a reasonable jury could find that Bare set up the ACH software to draw from the IOLTA. From that act and his later acquiescence to delayed settlement distributions to his

31

clients, a reasonable jury could also infer Bare's intent to exercise dominion and control over plaintiff's property. Therefore, Bare's motion for summary judgment will be denied on plaintiffs' conversion claim.

### viii. Plaintiffs' Negligence Claim

Plaintiffs' second amended complaint listed seven counts, none of which included a claim of negligence. (See 2d Am. Compl.). Plaintiffs' Brief in Opposition to Defendant Cunningham's Motion for Summary Judgment, however, asserts that "Plaintiffs have established a *prima facie* claim for negligence against Defendant Cunningham." (Doc. 158 at 16). Defendants Bare and Cunningham argue they are unfairly surprised by plaintiffs' attempts to raise a negligence claim at this point. In their defense, plaintiffs note that paragraphs 117 and 137 of their second amended complaint refer to negligence by the defendants.[11]

Plaintiffs cannot amend their complaint through their brief opposing summary judgment. See e.g. Gilmour v. Gates, McDonald and Co. ,382 F.3d 1312, 1315 (3d Cir. 2004); Shanahan v. City of Chicago, 82 F.3d 776,

---

[11]

> 117. Defendants Frankel & Associates, P.C., Cunningham, Bare and Frankel negligently failed to act in good faith and solely for the benefit of Plaintiffs in all matters for which they were employed and as a direct result of their negligence Plaintiffs were deprived of funds to which they were entitled.

(2d Am. Compl. at ¶ 117).

> 137. It is believed, and therefore averred, that the practice of borrowing money from the trust account by Mark Frankel and Stephen Frankel was negligently allowed to occur by the Defendants with gross indifference to the possible consequences.

(2d Am. Compl. at ¶ 137).

781 (7th Cir.1996). As this would be plaintiffs' third amended complaint, plaintiffs must obtain defendants' written consent or leave of the court in order to amend its complaint to include a negligence claim. FED. R. CIV. P. 15(a)(2). Thus, the court finds that no issue exists for trial on negligence.

**CONCLUSION**

For the foregoing reasons, the defendants' motions for summary judgment are granted in part and denied in part. Defendant Wachovia Bank's motion for summary judgment is granted in its entirety. Defendants Douglas Bare and Darryl Cunningham's motions for summary judgment will be granted only as to plaintiffs' claims of fraud and breach of fiduciary duty. Plaintiffs' claims against Bare and Cunningham for violation of RICO, RICO conspiracy, civil conspiracy, and conversion remain for trial. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRIAN STRAYER and THE PENNSYLVANIA LAWYERS FUND FOR CLIENT SECURITY,** Plaintiffs | No. 3:06cv2068 |
| | (Judge Munley) |
| v. | |
| **DOUGLAS BARE, ESQ.; DARRYL CUNNINGHAM, ESQ.; and WACHOVIA BANK,** Defendants | |
| **DOUGLAS BARE, ESQ. and DARRYL CUNNINGHAM, ESQ.,** Third-Party Plaintiffs | |
| v. | |
| **STEVEN STAMBAUGH, ESQ. and ANITA LIVADITIS,** Third-Party Defendants | |

## ORDER

**AND NOW**, to wit, this 6th day of January 2010, the defendants'
motions for summary judgment (Docs. 146, 149, 151) are hereby
**GRANTED** IN PART and **DENIED** IN PART, as follows:

1. Defendant Wachovia's motion for summary judgment (Doc. 149)
is granted on all of plaintiffs' claims;

2. Defendant Bare's motion for summary judgment (Doc. 151) is
granted with respect to plaintiffs' claims of fraud and breach of
fiduciary duty. The motion is denied in all other respects; and

3. Defendant Cunningham's motion for summary judgment (Doc.
146) is granted with respect to plaintiffs' claims of fraud and breach

34

of fiduciary duty.  The motion is denied in all other respects.

**BY THE COURT:**
**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**UNITED STATES DISTRICT COURT**